J-S60006-19

**NONPRECEDENTIAL DECISION  SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C. AND G.W. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1157 MDA 2019 |

Appeal from the Order Dated June 21, 2019
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000314-2018

BEFORE:   SHOGAN, J., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SHOGAN, J.:                **FILED JANUARY 28, 2020**

Appellants, J.C. and G.W., appeal from the June 21, 2019 order of the York County Court of Common Pleas finding that the dependent male child, J.D. ("Child"), born in March of 2018, was the victim of "child abuse" and that Appellants were the perpetrators of the abuse under the Child Protective Services Law ("CPSL").[1]  Upon careful review, we affirm.

J.C. is the maternal grandmother of Child, G.W. is her paramour, and they reside together.  N.T., 5/24/19, at 6.[2]  The record reveals that Child,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  23 Pa.C.S. §§ 6301–6386.

[2]  Child's mother is S.D. ("Mother").  N.T., 5/24/19, at 19.  Child's biological father is K.L. ("Father").  Child's legal father is T.D. ("legal father").  Mother and legal father cohabited during the relevant period in this case, and Child resided with them.  Mother, Father, and legal father are not parties to this appeal.  *Id.* at 3.

then four months old, was in the custody of Appellants in their home from Saturday, July 28, 2018, at 7:30 p.m., when Mother dropped him off, until Monday, July 30, 2018, at approximately 11:30 a.m., when Mother retrieved him and drove him to York Hospital Emergency Room.  N.T., 5/14/19, at 1718; N.T., 5/24/19, at 7, 8, 21–22; N.T., 6/13/19, at 10.  York Hospital transferred Child on that same date to Hershey Medical Center, where he was designated "a near fatality" due to serious head injuries.  N.T., 5/14/19, at 18, 20.

The juvenile court placed Child in the emergency custody of York County Office of Children, Youth & Families ("CYF") on October 5, 2018, following the expiration of a safety plan for Child.  On October 25, 2018, the court adjudicated Child dependent.  During the dependency hearing, the court deferred presiding over CYF's request for a finding of abuse and the identity of the perpetrators of that abuse because both CYF and law enforcement were still investigating the matter.

On February 20, 2019, CYF filed a Motion to Schedule  Hearing on [CYF's] Request for a Finding of Abuse.  Motion, 2/20/19.  CYF alleged that on October 29, 2018, it learned that the criminal investigation "was being closed with no charges being filed due to the inability to date the injuries [sustained by Child], and to identify a specific perpetrator."  *Id.* at ¶ 22.  CYF alleged that on November 5, 2018, it submitted an indicated finding of physical abuse of Child, with an unnamed perpetrator of that abuse, to the Childline and Abuse Registry.  *Id.* at ¶ 23.  CYF alleged that it subsequently received additional medical records regarding Child's injuries.  *Id.* at ¶ 24.  As a result,

2

CYF requested that the court hold an evidentiary hearing to determine whether Child is a victim of "child abuse" as defined in the CPSL and the identity of the perpetrator.

A hearing occurred across four days, on May 14, 2019, May 20, 2019, May 24, 2019, and June 13, 2019. On the first day of the hearing, the parties entered into a written stipulation regarding the authenticity and admissibility of CYF's Exhibit 17, which included, in part, medical records and sixty-one color photographs of Child taken at York Hospital. Based on the medical records, the parties stipulated that Child suffered the following injuries:

> a. Multiple bruises on [his] chest, lower back, right ear, suprapubic area;
>
> b. Left forehead swelling and bruise;
>
> c. Nondisplaced fracture of left parietal bone with large overlying scalp soft tissue hematoma;[3]
>
> d. Acute subdural hemorrhages[4] in left frontal, temporoparietal, right high parietal convexity and interhemispheric fissure;[5]

---

[3] Gloria Lee, M.D., who examined Child when he arrived at the Hershey Medical Center, described this injury as "a fracture on the left side of his head called the parietal bone, and the swelling over the fracture. . . ." N.T., 5/14/19, at 28.

[4] Dr. Lee described "acute subdural hemorrhage" as "fresh bleeding between the brain and the skull." N.T., 5/14/19, at 27.

[5] Dr. Lee described "interhemispheric fissure" as "bleeding between the two halves of the brain." N.T., 5/14/19, at 27.

e.     Nineteen (19) healing rib fractures;

f.     Elevated LFT's and lipase,[6] and liver laceration.

Stipulation, 5/14/19, at 2.  Moreover, the parties stipulated that these injuries

constituted "child abuse" pursuant to Section 6303(b.1)[7] and "serious bodily

injury" pursuant to Section 6303(a).[8]  ***Id.*** at 3.

---

[6] As best we can discern, elevated LFTs and lipase are "liver function tests" that Dr. Lee described as "elevated, which suggested to us that there may be a liver injury.  So we then ordered a CAT scan of [Child's] abdomen, and this confirmed a liver laceration."  N.T., 5/14/19, at 29.

[7] Section 6303 of the CPSL defines "child abuse" as follows, in relevant part.

**§ 6303.  Definitions.**
* * *

**(b.1) Child abuse*.—*** The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

(1) Causing bodily injury to a child through any recent act or failure to act.

* * *

(8) Engaging in any of the following recent acts:

* * *

(iv) Forcefully slapping or otherwise striking a child under one year of age.

23 Pa.C.S. § 6303(b.1)(1), (8).

[8]  Section 6303 defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss of impairment of function of any bodily member or organ." 23 Pa.C.S. § 6303(a).  Section 6303 defines "bodily injury" as "[i]mpairment of physical condition or substantial pain."  ***Id.***

4

During the hearings, CYF presented the testimony of its caseworker, Denise McCann, and Hershey Medical Center physician and medical expert in general pediatrics and child abuse pediatrics, Gloria Lee, M.D., *via* telephone. N.T., 5/20/19, at 4–79 and N.T., 5/14/19, at 15–67, respectively. Appellants testified on their own behalf. N.T., 5/24/19, at 4–65; N.T., 6/13/19, at 4–101.

At the conclusion of the testimonial and documentary evidence on June 13, 2019, the court set forth its findings of facts and conclusions of law on the record in open court. N.T., 6/13/19, at 114–124. The order was transcribed and entered on the docket on June 21, 2019. Specifically, the trial court found:

> [T]he testimony clearly established that [J.C.] and [G.W.] were the joint caregivers of the minor child from 7:30 p.m. Saturday, July 28th, 2018, through approximately 11:00 or so Monday morning, July 30, 2018. The testimony established that the child was in no one's care or under no one's responsibility but for [J.C.] and [G.W.].
>
> * * *
>
> [The c]ourt believes that the evidence here today establishes a prima facie evidence case against [J.C.] and [G.W.]. That the two of them were the shared custodians and caregivers for [Child] between the evening of [July][9] 28th and late morning on July 30th, 2018. That they were responsible for the child's well-being, welfare, and safety, and that the head injuries, based on the testimony of Dr. Lee, an expert acknowledged by all parties

---

[9] In open court and in the transcribed order, the juvenile court mistakenly stated "January" instead of "July." N.T., 6/13/19, at 123; Order, 6/21/19, at 12.

5

before the [c]ourt, occurred during that time period when they were the sole joint caregivers of the minor child. Thus, the [c]ourt finds that as it relates to [Child]'s head injury,[10] he is a victim of child abuse and [J.C.] and [G.W.] are the perpetrators of that abuse.

Order, 6/21/19, at 8–9, 12.

Appellants timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On August 2, 2019, the court referenced its June 21, 2019 order in lieu of filing a Rule 1925(a) opinion.

On appeal, Appellants present one issue for our review:

I.    Did the trial court err when it made a finding of abuse against Appellants where there was insufficient evidence to prove abuse or an omission to act where the Appellants discovered the injury and arranged for [Child] to get medical attention?

Appellants' Brief at 4.

We review this appeal for an abuse of discretion. ***In the Interest of L.Z.***, 111 A.3d 1164, 1174 (Pa. 2015). The standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility

_____

[10] With respect to Child's other injuries, the court found the evidence did not sufficiently narrow the timeframe of when they occurred. Order, 6/21/19, at 6. Dr. Lee's testimony supports the court's finding insofar as she stated that Child's injuries did not occur at the same time. N.T., 5/14/19, at 38. She explained that Child's diagnostic testing revealed "callous formations" in his rib fractures, which is part of the healing process and normally occurs ten to fourteen days after fracture. ***Id.*** at 34–35, 39. In addition, Dr. Lee testified that, although vomiting could be a symptom of a laceration in the liver, "[i]t's hard to say" when that symptom would manifest after the injury has occurred. ***Id.*** at 38.

determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***Id.*** (citation omitted).

The identity of the perpetrator of child abuse "need only be established through *prima facie* evidence in certain situations. . . ." ***Interest of L.Z.***, 111 at 1174. *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." ***Id.*** at 1185 (citing Black's Law Dictionary 825 (6th ed. abridged 1991)).

Section 6381(d) of the CPSL provides:

> **§ 6381.  Evidence in court proceedings.**
>
> * * *
>
> **(d)  Prima facie evidence of abuse.**—Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.
>
> * * *

23 Pa.C.S. § 6381(d).  The ***L.Z.*** Court held:

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption.  The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for

7

the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*Interest of L.Z.*, 111 A.3d at 1185 (footnote omitted). The Court emphasized, "[W]hen a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child." *Id.*

In this case, Appellants assert that they successfully rebutted the presumption that they were the perpetrators of the abuse. Specifically, Appellants assert:

> The trial court heavily relied on the testimony of Dr. Lee when it made its finding of abuse regarding the head injury of the [Child]. While Dr. Lee's written documentation opined that the head injury to the [Child] occurred within a timeframe of seventy-two (72) hours prior to the [Child]'s CT scan,[11] the trial court primarily focused on her testimony that the injury would have been "immediately symptomatic" and apparent to a caregiver.
>
> In this case, Dr. Lee specified that "immediately symptomatic" meant that the [Child] would have been fussy, vomiting, lethargic, and otherwise not acting like himself. Dr. Lee clarified that the vomiting and other noted symptoms were examples of how [C]hild's behavior would have been different. Testimony from Appellants clearly established that [Child] was fussy and not eating as he normally had when he arrived at Appellants' home at 7:30 p.m., on Saturday, July 28, 2018.

---

[11] CT scan is a "Computed Tomography" scan, also known as a CAT scan. Dr. Lee testified that the CT scan of Child's head was performed at York Hospital on July 30, 2018. N.T., 5/14/19, at 27.

> Evidence also established that [Child] continued to be fussy throughout his time in Appellants' care. However, Appellants reasonably attributed this fussiness in [Child] to a recent change in his diet to solid foods. Dr. Lee's opinion never took this factor into consideration, whether the "immediate symptoms" would be of a different or more severe nature than those exhibited as a result of a recent change in a child's diet.

Appellant's Brief at 10–11.

Appellants testified that they babysat Child in their home overnight every Wednesday into Thursday and every Saturday into Sunday. N.T., 5/24/19, at 78, 31–32; N.T., 6/13/19, at 89. Appellant J.C. testified that Child "had been fussy through the month of July. He had just started eating cereal and fruit. He was gassy. He was constipated, but other than that, he was perfectly fine." N.T., 6/13/19, at 8.

J.C. testified that on the evening of Saturday, July 28, 2018, Child "had been very fussy . . . he appeared to be very uncomfortable." N.T., 6/13/19, at 12. She noted that she "assumed that [it] was due to his diet, the change in his diet."[12] *Id.* at 13. J.C. maintained that Child's head appeared perfectly normal on Saturday, July 28, 2018. *Id.* at 53–54. J.C. testified that Child's "fussiness" continued on Sunday, July 29, 2018. *Id.* at 15. She stated that on July 28 and 29, 2018, "he spit up like a regular baby, nothing that caused me any sort of alarm," but he did not vomit. *Id.* at 16.

---

[12] There is no evidence in the record that any of Child's "fussiness," as described by Appellants, was due to a change in his diet.

9

Although Child was "fussy," J.C. explained, "I don't believe he woke up in the middle of the night" on Saturday, July 28, 2018. N.T., 6/13/19, at 15. She explained, by that time, Child had been sleeping for six hours in the middle of the night when at her house. *Id.* at 14–15.

J.C. indicated that on Sunday, July 29, 2018, she and G.W. "were in the house all day" except when she went out alone at 2:00 p.m. to visit her friend and to pick up pizza. N.T., 6/13/19, at 15, 59–61. J.C. stated she had a habit of visiting her friend every time she ordered pizza because her friend lived next door to the pizza establishment. *Id.* at 60–61. J.C. testified that on the afternoon of July 29, 2018, she was gone for "an hour or two." *Id.* at 60.

J.C. stated that after she returned home and ate the pizza, she took Child upstairs with her while she folded laundry, and "he proceeded to take a fairly long nap" on her bed, which was at approximately 5:00 p.m. on Sunday, July 29, 2018. N.T., 6/13/19, at 15–16. While Child was napping, Appellant G.W. came into the bedroom and pointed to a mark on Child's head. *Id.* at 17. J.C. did not describe which side of Child's head bore the mark, but she noted the mark was "swollen outward," which made it look like Child's head "wasn't rounded on the one side . . . ." *Id.* at 17–18. J.C. continued, "It wasn't huge. It wasn't alarming." *Id.* at 17. J.C. stated she did not notice any discoloration or bruising, but she and G.W. did think it was "strange." *Id.* at 19. In addition, when she touched the swelling on Child's head, it did not cause Child to "exhibit any sort of pain response." *Id.* at 18.

10

J.C. maintained that Child awoke from his late nap on Sunday, July 29, 2018, between 7:30 p.m. and 8:00 p.m. N.T., 6/13/19, at 20. She went to bed early that night because she had to awaken at 3:00 a.m. on Monday, July 30, 2018, to go to work. *Id.* at 20, 62. Therefore, J.C. testified that Appellant G.W. was alone with Child on Sunday night until Child fell asleep. *Id.* at 62.

Appellant J.C. testified that on Monday, July 30, 2018, Child "woke up when I woke up [at 3:00 a.m.], which was unusual . . . . Now, occasionally he would wake up with my alarm, but not all the time." N.T., 6/13/19, at 20. She stated, "When he did wake up with my alarm, he seemed particularly fussy, and at that point it looked as if the swelling that we saw on his head had gotten much larger." *Id.* at 20–21. Appellant J.C. described the size of the swollen area on that early morning as "between a dime and a quarter maybe . . ., and it was swelling outward." *Id.* at 21. She testified that Child still did not have a pain response when she "moved [her] hand over [the swelling]." *Id.* Thereafter, J.C. made a bottle for Child, which she gave to G.W. to feed Child, and she left for work at approximately 4:30 a.m. *Id.* at 21–22.

Similarly, G.W. testified that Child had been "fussy," and "[t]hat was the reason I was bottle feeding him. Normally, he would have gotten the bottle and solid food. He was just acting a little off, so we didn't want to stress him anymore." N.T., 5/24/19, at 43.

11

G.W. testified that on Sunday, July 29, 2018, Child "had fallen asleep in an awkward position for approximately two hours." N.T., 5/24/19, at 11. G.W. clarified, Child "had just his head on its side." *Id.* When Child awoke at 5:00 or 6:00 p.m., Appellant G.W. noticed a swollen mark above Child's left ear. *Id.* at 15. He stated, "I thought it was maybe a bug bite or something. We have cats. I wasn't sure if maybe we had a flea or something in the house, something along those lines." *Id.*

G.W. testified that Child went to sleep at 10:00 p.m. or 11:00 p.m. on Sunday, July 29, 2018, and Child awoke at 12:30 a.m. N.T., 5/24/19, at 15. He stated that Child "was fussy that night," and he, not J.C., tended to Child. *Id.* at 15–16. G.W. stated that he was up with Child "a couple of times" in the early hours of Monday morning. *Id.* at 16. G.W. testified that when Child awoke at 3:00 a.m., "we tried giving him a bottle. [H]e really didn't want that, but he ended up falling back to sleep." *Id.* at 17.

G.W. noted that Child awoke for the day on Monday, July 30, 2018, at approximately 8:00 a.m., at which time he had diarrhea. N.T., 5/24/19, at 17, 41. G.W. testified, "And just in the morning I noticed he had diarrhea. So I assumed that was why he was fussy that night [Sunday night into Monday morning]." *Id.* at 41. G.W. also noticed that the swelling remained on Child's head, but he had no pain reaction to it. *Id.* at 17.

G.W. testified that at approximately 10:30 a.m. on Monday, July 30, 2018, Child did react when G.W. inadvertently brushed his hand against the

12

swelling. N.T., 5/24/19, at 18, 20. G.W. described the response as "[Child] didn't scream. His eyes opened up real wide, and his limbs kind of shot out." *Id.* at 18. G.W. then became alarmed, and approximately twenty minutes later, after placing a bag of frozen peas on Child's head, G.W. telephoned J.C. at work and asked, "[S]hould I call an ambulance, [or] take him to the doctor, and [J.C.] said she would call [Mother] and see what she would want to do with him." *Id.* at 19. Appellant G.W. testified that J.C. contacted him a few minutes later and told him that Mother "was on her way." *Id.* at 20.

With respect to Child's head injury, the juvenile court explained, as follows:

> Dr. Lee gave extensive testimony that supplemented and fine-tuned her written documentation regarding the injuries and the likely time frame.
>
> While her written documentation had indicated that the head injury which caused the brain bleeding, brain bruising, and the fractured skull could have occurred perhaps up to 72 hours, her verbal testimony greatly narrowed that time frame in that she stated that the head injury would have been immediately noticeable to any caregiver and cause said caregiver to seek medical care urgently, and I'm paraphrasing, not directly quoting.
>
> Dr. Lee's testimony went on to say that the child would have been "immediately symptomatic" within a few hours maximum, that the scalp swelling would have been very noticeable. She went on to say that as a result of the head injury, there would have been clearly and persistently symptomatic signs that would have been seen by [J.C.] and [G.W.] at the time of the child being dropped off Saturday night at 7:30 if the injury had occurred prior to the mother . . . dropping the child off to [Appellants'] residence.
>
> [Dr. Lee] was, in the [c]ourt's opinion, crystal clear that given the severity of the head injuries to [C]hild, that [C]hild could not have gone for almost 40 hours before exhibiting the alarming

13

symptoms that [Appellants] state were not evident until mid-morning on Monday, July 30th.

Order, 6/21/19, at 6–8.

Indeed, Dr. Lee testified on direct examination as follows:

[W]e know that the brain bleeding and the skull fracture were clearly acute, meaning it would have happened no more . . . than three days [earlier]. So it could be less than two, three days before the CAT scan of the head imaging were taken.

Again, . . . we're not able to distinguish whether it happened one to two days or two to three days, just that it could have been up to two to three days [before the CAT scan was performed]. . . .

N.T., 5/14/19, at 35–36. Dr. Lee continued:

Q. [By CYS counsel]: And you said specifically that as it pertains to the brain bleeding and the skull fracture; am I correct?

A. Correct. In addition, the head injury would have been immediately symptomatic and it would have been observable by the caregivers. So for example, [Child] would have been fussy, he would have not been himself, he . . . could have had vomiting, lethargy, and this would have prompted the caregiver to seek medical attention for [Child].[13]

*Id.* at 36. On cross-examination by J.C.'s counsel, Dr. Lee testified:

Q. This child was approximately four months old. And based on your experience dealing with these cases and these young children, are you able to see a significantly recognizable form of lethargy in a child that young?

A. Yes.

\* \* \*

---

[13] Dr. Lee testified that Child's head injury could involve some or all of the symptoms she described. N.T., 5/14/19, at 65–66.

14

A.   [A]ny caregiver would notice also.  They wouldn't be eating as well, they'll be more fussy, and the scalp swelling was very noticeable.

*Id.* at 56–57.

Significantly, Dr. Lee stated, "[A]fter the head injury, it wouldn't have taken long, maybe a few hours max, in which [Child] would have presented with vomiting, fussiness, decreased energy.  So he wouldn't have gone a few days with being lethargic without the caregiver knowing."  N.T., 5/14/19, at 56.  On inquiry by the juvenile court, Dr. Lee clarified:

Q. [By the court]: As to the head injury, . . . and that the symptoms . . . you state would have been showing within hours, so if [J.C.], either first noticed injuries Monday morning sometime, it's your testimony based on the severity of the head injury that the injury would have been within hours of Monday morning, certainly not more than 36 hours earlier; is that correct?

A. Correct.  It would have been hours or less.

*Id.* at 66.

Finally, it is important to note Dr. Lee's testimony on cross-examination by Mother's counsel, as follows:

Q. [By Mother's counsel]: And did [Mother] offer any explanation to you as to what happened?  Did she have any knowledge of what had happened?

A. So it started off by her saying she went to pick [Child] up from [J.C.]'s house that morning, and she noticed that [Child] had a bruise on his left forehead and some bruises on his chest and his abdomen, and she reported to me that [Child] was in the care of [J.C.] and . . . [G.W.], from Saturday, 7:00 p.m. until 11:30 a.m. that morning . . . .

She explained that [Child] usually stays at [J.C.'s] house every Saturday as well as some Wednesday evenings, and when

15

> she saw these bruises, she asked [J.C.] how [Child] got the swelling and the bruise on his forehead. And at this time, [J.C.] had denied any knowledge of what happened and stated that she also first noticed it that morning. . . .

N.T., 5/14/19, at 48–49. In addition, Dr. Lee testified Mother told Dr. Lee that upon Mother's arrival at the home of J.C. and G.W., Mother found Child to be "extremely tired, lethargic and not himself." *Id.* at 37. Dr. Lee also stated that Mother reported "there was one vomiting episode [by Child] when she got to York Hospital." *Id.*

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the juvenile court in finding Appellants perpetrators of "child abuse" pursuant to the CPSL for Child's near fatal head injuries that occurred while in Appellants' sole care and custody from Saturday, July 28, 2018, at 7:30 p.m., until Monday, July 30, 2018, at 11:30 a.m. Specifically, Dr. Lee explained that Child would have presented with noticeable symptoms "within a few hours max[imum]" of sustaining the injuries. N.T., 5/14/19, at 56.

Appellants testified that they noticed the swelling on Child's head while he took a lengthy nap in an unusual position in the early evening of Sunday, July 29, 2018. Appellants maintained that Child slept poorly on Sunday night into Monday morning. J.C. testified that by 3:00 a.m. on Monday, July 30, 2018, Child was "particularly fussy," and his swelling was "much larger." N.T., 6/13/19, at 20–21. G.W. noted that by 10:30 a.m. on July 30, 2018, Child exhibited pain when G.W. inadvertently touched the swelled area. N.T., 5/24/19, at 18, 20.

Based on this evidence, we reject Appellants' contention that Child never exhibited symptoms more severe than fussiness due to a change in diet. Indeed, Appellants testified that Child, by the early evening of Sunday, July 29, 2018, when he had been in their sole care for nearly twenty-four hours, had swelling above his left ear, which worsened by 3:00 a.m. on Monday, July 30, 2018, along with other symptoms of a disrupted sleep pattern, diarrhea, increased fussiness, and refused to take his bottle. By 10:30 a.m., Child exhibited pain when the swelling on his head was touched. Based on Dr. Lee's testimony, the juvenile court did not abuse its discretion in finding that "[C]hild could not have gone for almost 40 hours before exhibiting the alarming symptoms that [Appellants] state were not evident until mid-morning on Monday, July 30th." Order, 6/21/19, at 8.

Contrary to Appellants' contention, the record evidence demonstrates that Child, when four months old, suffered head injuries that "would ordinarily not be sustained or exist except by reason of the acts or omissions of" Appellants who were responsible for Child's welfare from July 28, 2018, at 7:30 p.m., until July 30, 2018, at approximately 11:30 a.m. **See** 23 Pa.C.S. § 6381(d). As such, *prima facie* evidence exists of child abuse by Appellants. To the extent that Appellants attempted to rebut the presumption that they are the perpetrators of the "child abuse" in this case, the record supports the court's conclusion that they failed to do so. Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/28/2020